**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

CHEREE BOLING,
      **Plaintiff,**

v.
                                                     Civil Action No. 1:08-CV-112
                                                     (Judge Keeley)

MICHAEL J. ASTRUE, COMMISSIONER OF
SOCIAL SECURITY,
      **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

### I. Procedural History

Cheree Boling ("Plaintiff") filed applications for DIB and SSI on May 19, 2004, alleging disability beginning April 1, 2003, due to left knee problems, pancreatitis, and high blood pressure (R. 73). Plaintiff's Date Last Insured for DIB purposes is June 30, 2003 (R. 718). Both applications were denied initially and on reconsideration (R. 38, 39, 713). Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") Karl Alexander held on January 26, 2006 (R. 754). Plaintiff, represented by counsel, was present and testified, as did Vocational Expert Timothy Mahler ("VE") (R. 392). On April 21, 2006, the ALJ issued an unfavorable decision (R. 22). On March 7, 2008,

the Appeals Council denied Plaintiff's request for review (R. 8), rendering the ALJ's decision the final decision of the Commissioner.

## II. Statement of Facts

Cheree Boling ("Plaintiff") was born on July 25, 1965, and was 37 years old on her alleged onset date and when her insured status expired for purposes of DIB on June 30, 2003 (R. 62). She dropped out of school in the 8th grade and married at the age of 16 (R. 135, 591). She has past work experience as a CNA in nursing homes and in private service (R. 78).

On January 13, 2003, Plaintiff was diagnosed with left knee strain from a work injury. Her physician, Dr. Hatch, requested a knee injection, NSAID meds, and physical therapy. He reported her work status as sedentary. One week later Dr. Hatch said Plaintiff's knee pain was localized to the patella. There was no effusion, no STS, and no instability (R. 150).

Plaintiff presented to physical therapy on January 22, 2003, for evaluation of her "left knee strain" (R. 473). Four weeks of physical therapy was recommended at 2 times per week. Plaintiff attended physical therapy on January 23, 27, and 29, 2003 (R. 472). She received electrical stimulation, hot pack, cold pack, and ultrasound heat therapy. She had no complications or complaints due to therapy and tolerated modalities well. She did complain of leg swelling after being on her feet for awhile. She said she had not been at work and that therapy helped her pain. It was recommended that she continue therapy. After her third session she said she still had discomfort in her left knee, but the swelling had decreased.

On February 3, 2003, Plaintiff told Dr. Hatch there was no significant change in her knee (R. 149). There was some short-term improvement after 4-5 physical therapy sessions. Dr. Hatch assessed left knee strain and continued Plaintiff on therapy. He suggested injections, but Plaintiff

did not "want to get sick from that medicine (steroid)."

Plaintiff attended physical therapy on February 3, 5, and 6, 2003 (R. 468, 469), including electrical stimulation, hot pack, cold pack, and ultrasound heat therapy. Plaintiff complained of knee pain and swelling. She tolerated modalities well. Objectively, the swelling decreased from the last session. Therapy was continued for two more weeks. On February 6, Plaintiff said she had had an epidose of severe left knee pain after bending down to pick up something the night before. She had tears in her eyes from the pain. Her knee was not red or swollen, and she tolerated modalities well. Plaintiff's last day of physical therapy was February 10, 2003 (R. 466). She had electrical stimulation, cold pack, and ultrasound heat therapy. She had no complaints, and it was reported she was doing better. She tolerated modalities well. It was recommended she had completed her therapy and she was discharged from treatment.

Two weeks later Plaintiff saw Dr. Hatch who stated her knee was improving and examination showed decreased tenderness of the knee with no STS (R. 148). Dr. Hatch assessed left knee strain – improving. She was to follow up in two weeks to address her work status. For now she was allowed to perform usual work activities three hours per day.

On March 12, 2003, Plaintiff reported to Dr. Hatch that she had increased knee pain after working eight consecutive days (R. 147). She had an occasional sharp increase in pain with sudden movement, especially turns. Upon examination, there was no gross instability and no effusion. There was tenderness of the medial knee difficult to localize. Plaintiff's gait was smooth and efficient with a slight left limp. The assessment was left knee strain-chronic pain. Dr. Hatch recommended a hinged knee brace. He opined she could work with weight bearing as tolerated. He advised her to use warm compresses. Her work status was: continue current work, advance hours

as tolerated (R. 474).

Plaintiff's alleged onset date is April 1, 2003.

On April 2, 2003, Plaintiff reported to Dr. Hatch that she had continued left knee pain (R. 146 )  Dr. Hatch wrote: "Pt.  Has been fired."  She reported occasional left knee "giving way." Upon examination there was no effusion or STS.  She had reproducible knee pain along the medial joint line with palpation and negative  McMurray.  She had a left antalgic gait.  Dr. Hatch assessed left knee pain–consider internal derangements.  He then stated:  "Cheree has reached MMI; 0% PPI by Florida guidelines; there may be a medial meniscal injury– at this point, I only have diagnostic arthroscopy to offer patient other than current non-operative management.  Work Status–Continue current 5 hrs. per day."

Three weeks later, Plaintiff told Dr. Hatch she could not stand on her leg as much, and complained "I haven't found a job yet" (R. 145).  She continue to complain of left medial knee discomfort, but the pain was "not bad."  Upon exam,  pain was localized to the left medial patella-femoral region.  She had a slight left antalgic gait with no STS.  Dr. Hatch assessed  left knee pain, and stated:  "Pt. does not want steroid injection but I recommend intra-articular injection left knee to determine if pain is intra-articular (i.e. patella-femoral.)  I would like to perform an intra-articular injection with Marcaine to review the possibility of internal derangement and need for further workup.  Of note is that patient is adamant about receiving no corticosteroids."  He asked her back to the clinic in two weeks.  Her work status was listed as: Five hours per day with modified light duty with modifications as to knee and advance to tolerance.

On June 18, 2003, Plaintiff went to the  ER for stomach and chest pain for three weeks that got worse that day (R. 172).  She said she  had vomiting with foamy blood, and said she had had

similar symptoms "years ago." The Impression was acute abdominal pain and acute pancreatitis. She was admitted to the hospital (R. 483-504). A CT scan that date showed increased density around the head of pancreas, with a small amount of fluid and no well-organized fluid collections. There was no evidence of focal pancreatic mass. The common bile duct was not distended and there was no common bile duct stenosis. The liver and spleen were normal. Adrenal glands and kidneys were unremarkable. Pelvic scans showed a possible large ovarian cyst. X-rays of the abdomen and chest showed unremarkable intestinal gas pattern with no evidence of free air, mass effect or ileus. Chest X-rays showed hypoaeration of the lungs. The Impression was "poor inspiratory chest without evidence of acute cardiopulmonary process."

Plaintiff had a pelvic ultrasound which indicated a large predominantly cystic lesion without evidence of solid soft tissue component (R. 161). The specialist thought it may represent a large septal cystic remnant from the ovary.

An MRI showed a normal caliber common bile duct without evidence of common bile duct stone or obstructing process; Pancreatitis; and Mild bilateral effusions. Her chest showed very poor inspiration with mild bibasilar alectasis and suggestion of small bilateral pleural effusions. Cardiac silhouette and mediastinal structures were within normal limits. (R. 487).

The specialist opined Plaintiff's CT scan was consistent with acute pancreatitis. She was started on Levaquin/Flagyl. The etiology of the pancreatitis was unclear as the MRI of the biliary tract did not disclose evidence of a stone. She had a high fever each day, but no evidence of necrotizing pancreatitis. Overall her pancreatitis had improved. Her blood pressure was 150/80. She reportedly had hypertension but she had self-discontinued her medications four months ago after losing her health insurance and "not being able to work." She smoked a pack of cigarettes a day.

A subsequent CT of the pelvis showed some swelling and mild inflammatory changes along the anterior surface of the pancreas, but the extent of edema into surrounding tissues had decreased considerably since the previous study one week earlier. It also showed the possible ovarian cyst. The Impression was: "Persistent pancreatitis, though inflammatory changes have decreased in extent and severity since previous study of 6/19/03. No other signs of acute disease in abdomen or pelvis, but note ovarian cyst."

Plaintiff was discharged home on June 28, 2003, with a diagnosis of pancreatitis, improved; ovarian cyst; and hypertension (R. 160). Her condition on discharge was stable. She could perform activities "as tolerated." Upon examination, her extremities were unremarkable. CT showed persistent pancreatitis. Chest x-rays showed pleuritis. An MRI of the biliary tree showed normal caliber of common bile duct, without evidence of common bile stone or obstructing process.

Plaintiff's date last insured was June 30, 2003.

On August 6, 2003, Plaintiff presented to Jessica Murphy, DO (R. 301). She had been in and out of the hospital for acute pancreatitis. She had been out of medications for over a week and was having some belly pain. She also had high blood pressure and GERD. Upon exam, Plaintiff's blood pressure was "a little elevated, otherwise stable." Her lungs were clear. She had no upper or lower extremity edema. She had some epigastric tenderness, non-distended, with no hepatosplenomegaly. The assessment was Pancreatitis, hypertension, and GERD.

A week later, Plaintiff presented to Dr. Murphy for follow up (R. 299). Her levels had been back to normal, but she now reported having "lots" of nausea, insomnia, and abdominal pain with no vomiting or diarrhea. She had no fever or chills. The doctor noted she looked really tired and worn out. Upon examination, her vital signs were stable and her lungs were clear. Her abdomen

6

was tender in the pancreatic area right in the epigastric region. There was no hepatosplenomegaly or upper or lower extremity edema. Dr. Murphy assessed pancreatitis, hypertension, GERD, peptic ulcer disease ("PUD"), bronchial asthma, nausea, insomnia, asthma--stable, and high blood pressure--very stable. She would try to treat Plaintiff's GERD with with Prevacid. The doctor stated: "She can get to work. I am going to write a letter to Diane Forbs at DHHR stating that it will be another month or two before she is able to work." That same day Dr. Murphy wrote a letter stating: "She is ready to go to work and that is her wish. We continue to see the patient but feel she is unable to work or return to work for the next couple months until we get her pancreatitis resolved" (R. 298).

On September 3, 2003, Plaintiff complained to Dr. Murphy of continuing dysphagia, diarrhea after eating, and epigastric pain (R. 296). Upon exam, her lungs were clear. She had positive epigastric tenderness with no real guarding or rebound and no hepatosplenomegaly. Dr. Murphy assessed pancreatitis, GERD, and hypertension.

A biopsy of the antrum of the pancreas on September 16, 2003, was without diagnostic abnormalities (R 223). An endoscopy that same date showed some mild gastritis; no gross abnormalities of the duodenum; slight hiatal hernia with a Schatzki's ring; and no evidence of Barrette's esophagus (R. 214). Her esophagus was surgically dilated. She tolerated the procedures well. The impression after the endoscopy was 5cm hiatal hernia; Schatzki's ring; mild antritis; no obstructive process. She was to continue proton pump inhibitor therapy and an ulcer free diet.

On October 10, 2003, gastroenterologist Dr. Conley called Plaintiff's endoscopy essentially normal. Her blood pressure was 104/60. He diagnosed GERD/dyspepsia, nausea, and vomiting and negative endoscopy (R. 213).

On November 4, 2003, Plaintiff presented to the ER with complaints of a one-day history of nausea, vomiting and upper abdominal pain, worse in the epigastric area (R. 174). She described the symptoms as similar to an episode of pancreatitis she had had in June for which she had been hospitalized. She was on no medication. She went to the hospital at Webster Springs where she was given Demerol and Phenergan which helped her pain, and was then transferred to CAMC. She rated her pain now as four out of ten. Her past history included one episode of pancreatitis in June 2003; no diabetes; no high blood pressure; no heart or lung disease; and no family history of pancreatitis. Upon examination, Plaintiff was well developed, well-nourished, and in mild distress. Her blood pressure was 129/81. Her chest had few rhonchi and full and equal breath sounds. The chest wall was nontender. Her abdomen had slight bilateral upper quadrant tenderness. There was no guarding, no rebound, no mass, and no hernia. Her extremities had full range of motion, intact neurovascular, and no edema. Plaintiff reported that Demerol had reduced her pain to three out of ten, but she was still uncomfortable. She was diagnosed with "probably recurrent pancreatitis." The Clinical Impression was abdominal pain with recurrent pancreatitis, and hypertension.

A November 4, 2003, x-ray showed cardiac, hilar and mediastinal silhouettes all normal. (R. 179). Plaintiff's lungs were clear. There was no evidence of effusion or pleural thickening. There was no evidence of free intraperitoneal air. Multiple surgical clips showed in the right upper quad where she had previously had her gallbladder removed. Bowel gas patterns were unremarkable- no abnormal air fluid levels or distended loops. Air was scattered throughout the colon and rectum. There was no evidence of bowel obstruction. An Upper GI Series showed the esophagus was normal without evidence of stricture, obstruction or mass effect. There was no evidence of peptic ulcer disease, gastric mass or gastric outlet obstruction. The duodenum was

unremarkable. The Impression was "Normal upper GI series. No evidence of peptic ulcer disease" (R. 180). Plaintiff was discharged the next day with instruction on diet and activity "as tolerated"(R. 185).

On November 12, 2003, Dr. Conley stated that Plaintiff had a "[v]ague history of pancreatitis although most of her labs I have seen not been evidence of that. She had an upper endoscopy which has been normal as well" (R. 212). Dr. Conley's diagnosis was "abdominal pain of questionable etiology." He scheduled an MRCP to look at the pancreatic and common bile duct.

On November 21, 2003, Orthopedic surgeon Joseph Snead, MD saw Plaintiff for her knee pain (R. 205). She reported continued pain and swelling. Upon examination, there was no swelling, loss of motion or redness in any joint except the left knee. She was in no acute distress. She walked with a "barely detectable limp." She had full range of motion of the knee. She did have apprehension with patella subluxing laterally and some retro-patella crepitation. Lochman and McMurray tests were negative. Dr. Snead opined: "I believe based on the fact that the patient's knee demonstrated chondromalacia I'm going to treat her for chronic subluxing patella with a vigorous PT isometric rehab program."

Plaintiff had an abdominal MRI on November 26, 2003 (R. 225). The common bile ducts and pancreatic ducts were normal. There appeared to be a stenosis of the hepatic ducts with some dilatation of the hepatic duct and the hepatic biliary ducts. The impression was stenosis of the hepatic duct.

An x-ray of the abdomen that same day also indicated what appeared to be a stenosis of the hepatic ducts with some dilatation of the proximal hepatic duct and the hepatic biliary duct. (R. 442).

An MRI of the knee on December 2, 2003, showed small joint effusion but no torn meniscus or ACL.

On December 3, 2003, Dr. Conley noted that the MRCP did reveal stenosis of the hepatic duct (R. 210). He believed Plaintiff should have an ERCP. Her blood pressure that day was 100/62. Dr. Conley's diagnosis was stricture of the hepatic duct. He referred Plaintiff to specialist Dr. Charles Bou-Abboud for an ERCP.

On December 11, 2003, Plaintiff reported to physical therapy for her third visit (R.202). She reported the exercises were difficult to perform. She verbalized decreased pain and tenderness with treatment, however, and demonstrated increased tolerance with performance of exercises.

On December 11, 2003, Dr. Murphy noted that Dr. Conley had found Plaintiff had a hiatal hernia and blockage in her bile duct backing sludge up to her pancreas. He was sending her to a specialist to remove the blockage. Dr. Murphy found Plaintiff's asthma was under pretty good control, as was her blood pressure. The doctor noted she appeared more stable than in the past. On exam, her vital signs were stable, her lungs were clear, and there was no tenderness. Dr. Murphy assessed hypertension, pancreatitis, GERD, and bronchial asthma (R. 294).

On December 16, 2003, Plaintiff was able to perform complete revolutions on the stationary bike in physical therapy, but reported numbness with modalities (R. 201).

Plaintiff did not show up for physical therapy on December 18, December 22, or December 23.

On December 29, 2003, Plaintiff told the physical therapist she had fallen on the ice over Christmas and hurt her left knee (R. 199). She had electrical stimulus and exercises. She reported decreased pain and tenderness and increased tolerance after therapy. Two days later Plaintiff

reported at Physical Therapy that her knee felt a little better than at the previous session. (R. 199). Electronic stimulus decreased her pain and tenderness.

Plaintiff reported to physical therapy on January 5, 2004, complaining that "[h]er knee has really hurt the past few days and declined stationary bike due to pain"(R. 198). She verbalized decreased pain and tenderness after therapy with increased range of motion and decreased edema. This was to be her last session.

Two days later, Dr. Snead reported that physical therapy hadn't done Plaintiff any good, and that she still had severe anterior patellofemoral pain (R. 204). She slept with a pillow under her knee and could not get it straight because of pain. On examination Plaintiff had full extension but with pain. She had full flexion. There was no swelling. Dr. Snead wrote: "She does have an irritable painful patellofemoral joint." His diagnosis was chondromalacia of the patella. He recommended a series of injections to relieve pain but noted this would probably not do much in terms of increasing ability to squat or kneel, "which she will probably never be able to do again." He opined that she "[n]eeds to be rehabilitated for some kind of job that does not involve squatting."

On January 13, 2004, Plaintiff saw Dr. Abboud upon referral from Dr. Conley for her pancreatitis (R. 420). Plaintiff had complaints of mid upper abdominal pain for over six months. Upon exam she was very pleasant and cooperative, well-appearing, and in no distress. Her lungs were clear to auscultation and resonant to percussion. Her abdomen bowel sounds were normal, but she did have exquisite direct tenderness over the epigastric area. She refused to let the doctor palpate deep, "as she stated she was going to vomit." There was no hepatosplenomegaly, no masses, no abdominal bruits or hernia. Extremities showed no edema or variscosities. Dr. Abboud diagnosed pancreatitis-recurrent; status post cholecystectomy; stenosis of the hepatic duct; epigastric

11

pain; GERD; diarrhea; and hiatal hernia; as well as rule out irritable bowel disease, and true versus artifact hepatic stenosis. He advised Plaintiff to elevate the head of her bed and to avoid fatty foods, chocolate, citrus, caffeine, alcohol, smoking, tight fitting clothes, eating within three hours of bedtime, or lying supine after meals. He said she should lose weight to her ideal body weight and have fiber supplementation. He recommended a repeat MRCP. He noted: "The etiology of her recurrent Pancreatitis is unclear: The proximal hepatic duct stenosis does not explain the patient's pain by itself and should not be contributing to her pancreatitis."

Dr. Abboud then noted:

A diagnostic colonoscopy has been discussed with the patient to R/O the above stated diagnosis. The procedure risks and benefits has been explained to the patient who is NOT agreeable to proceed (States would not be able to drink any prep).

A January 20, 2004, abdominal MRI and MRCP showed no evidence of choledocholithtiaisis. There was tortuosity of the common hepatic duct noted with no obvious stricturing seen. It was suggested that an ERCP examination should be considered as the next imaging stop. On February 13, 2004, this report was amended to add: "Saw previous films from Summersville which found common hepatic duct slightly tortuous, slightly narrow in its entire course. No pre-stenotic or post stenotic dilatation. However, a diffuse hepatic duct stricture is not excluded." (R. 433-437)

On January 28, 2004, Plaintiff reported to Dr. Conley that she still had some abdominal pain and some crampiness (R. 209). Dr. Conley opined: "I feel she has a lot of functional complaints and maybe this is some irritable bowel." He diagnosed pancreatitis "with normal MRCP." He noted that her MRCP at Summersville was read as abnormal, but a subsequent one in Beckley was normal. He planned to start Plaintiff on Elavil and continue her other medications.

Plaintiff presented to Dr. Murphy on February 4, 2004 (R. 292). Dr. Murphy states: "Cheree is still having a hard time with the remains of the pancreatitis." Her blood pressure was under good control. Her asthma was acting up because of wood smoke coming from neighbors' houses. The doctor opined that Plaintiff seemed to be ok otherwise, although she did have "some abdominal pain." She was back on medication for pancreatitis. Upon examination, her vital signs were stable. She was having some mild abdominal pain. Her lungs were clear. Her abdomen was soft and "not really tender." She had no guarding or rebound. There was no edema of the extremities. Dr. Murphy assessed hypertension, asthma, GERD, and pancreatitis.

On February 12, 2004, Dr. Abboud noted that the old MRCP showed "a questionable stricturing that I think is an artifact" (R. 403). Her lungs were clear. She had extreme tenderness in the epigastric area with tenderness in the left upper quadrant, with no rebound or guarding, no hepatosplenomegaly, no masses, and no abdominal bruits or hernia. Dr. Abboud noted: "Major Problem List: Pancreatitis-recurrence, cholecystectomy, epigastric pain, GERD, diarrhea, hiatal hernia." His Impression was: "Patient continues with epigastric and left upper quadrant pain as before. Rule Out lower pathology." He suggested referral to a tertiary care center as well as a pain clinic. Plaintiff was to discuss this plan with her primary care physician. Dr. Abboud discussed the possibility of a lower GI problem and suggested a colonoscopy, but Plaintiff "does not want a colonoscopy." He would "get an ACFE."

A February 17, 2004, colon barium enema showed "mild redundancy of the sigmoid portion of the colon and the transverse portion of the colon. No evidence of constricting lesion or obstruction. No mucosal lesion evidence. Study otherwise unremarkable above the sigmoidoscopic level." IMPRESSION: Normal air contrast barium enema above the sigmoidoscopic level. Dr.

Abboud noted the normal barium enema and suggested that the stenosis of the hepatic duct needed to be confirmed. He recommended proceeding with an ERCP to rule out stricture of the hepatobiliary system.

Dr. Conley noted that an ERCP was scheduled, and also noted that Plaintiff did have what appeared to be a stenosis of her common hepatic duct (R. 208). She still reported having quite a bit of abdominal pain radiating to her back, despite pain medications. He diagnosed pancreatitis with possible hepatic stenosis.

A March 12, 2004, ERCP showed no evidence of choledochollithiasis or biliary duct dilatation and no evidence of narrowing of the common hepatic duct (R. 413). Dr. Abboud read the results, finding "There was a completely normal biliary ERCP. The questionable hepatic ductal stricture mentioned on previous MRCP is not present. That area does fill up with dye to an adequate fashion. OVERALL IMPRESSION: Completely normal biliary ERCP."

On April 7, 2004, Dr. Conley noted that the ERCP was "non-revealing" (R. 207). Dr. Conley noted all liver function tests and pancreas tests had been normal as well as serology. Plaintiff reported still having some diarrhea and abdominal pain. Dr. Conley stated: "I feel she has a component of irritable bowel syndrome." Plaintiff said that the Elavil was making her too sleepy in the day time and she would like to either stop that or take half of a tablet in the morning. Dr. Conley assessed abdominal pain, diarrhea, GERD/Dyspepsia, anxiety component with some depression involved as well, and hypertension. She was to continue with her current medications, and add Lexapro.

On May 10, 2004, Dr. Abboud noted that Plaintiff had overall been stable on the current therapeutic regime (R. 395). She said she had had 3 sharp epigastric pain episodes during the past

14

few months.  She  contacted her primary care physician, but they would not call her in any pain medications and advised her to go to ER.  She did not go, however.  She said that lying down helped the pain.  There were no aggravating symptoms.  Upon exam, there was slight tenderness in the epigastric area, with no hepatosplenomegaly, no masses, no abdominal bruits or hernia.  Dr. Abboud diagnosed Chronic Pancreatitis.

Plaintiff filed her applications for SSI and DIB on May 19, 2004.

On May 20, 2004, Plaintiff presented to the hospital, stating she had pancreatitis and had been hurting in the upper gastric area for four days with nausea and decreased appetite (R. 226). Abdominal x-rays showed no evidence of obstruction (R. 229).  She was discharged that same day as "stable."

Four days later Plaintiff told Dr. Murphy she had been to the ER for pancreatitis  (R. 288). She said she had "flare ups" with pain about once a week and this one was pretty bad.  They did not keep her overnight but gave her some phenergan and Demerol and potassium.  She was not sleeping well.  She had no chest pain or headache.  On exam her vital signs were stable.  There was mild epigastric tenderness, but no hepatosplenagomegaly.  There was no edema of the extremities.  Dr. Murphy assessed Pancreatitis.

On June 7, 2004, Dr. Murphy noted that Plaintiff had still had some borderline hypokalemia at her last visit and was started on potassium  (R. 285).  She still had some episodes of abdominal pain and reported some diarrhea today.  Upon examination, Plaintiff's vital signs were stable, her lungs were clear with no  wheezes, rales or rhonchi, and her abdomen was soft with diffuse tenderness and some tenderness over the epigastric area and the pancreas.  There was no CVAT and no edema.  Dr. Murphy assessed  hypokalemia and  pancreatitis.

On June 14, 2004, Dr. Murphy wrote a "to whom it may concern" letter, stating she was treating Plaintiff for pancreatitis of unknown etiology, bronchial asthma, gastroesophageal reflux disease, peptic ulcer disease, hiatal hernia, and hypertension (R. 284). She opined that Plaintiff was currently disabled and unable to work due to these medical conditions, "of which the pancreatitis is the most serious."

On June 29, 2004, Plaintiff reported ear pain for three to four days, with no fever, cough or congestion (R. 281). Her blood pressure was 128/54. She was trying to quit smoking and was chewing more gum. She was having abdominal pain that she thought was related to pancreatitis. The diagnosis was right TMJ. She was advised to stop chewing gum.

On June 29, 2004, State agency reviewing physician Fulvio Franyutti, M.D. completed a Residual Functional Capacity Assessment ("RFC") (R. 230-237). He opined Plaintiff could lift 50 pounds occasionally and 25 frequently. She could stand/walk 6 hours in an 8-hour workday and sit 6 hours in 8-hour workday. She had no postural, manipulative, visual, communication or environmental limitations. He opined that her symptoms were attributable to medically determinable impairments. He considered her complaints of abdominal pain, pancreatitis, IBS, and arthralgia, and reduced her RFC to medium due to the above plus pain and fatigue. He considered Dr. Murphy's January 2004, statement that "claimant unable to work at present. Incapacity/Disability is expected to last 1 yr," and stated he disagreed with that opinion and opined that Plaintiff could perform medium work.

On July 19, 2004, Dr. Murphy saw Plaintiff for follow up for her pancreatitis, hyperkalemia, and high blood pressure. Her blood pressure was 110/64 that date (R 279). Plaintiff complained of some belly pain and some nausea. She denied abdominal pain, nausea, vomiting and diarrhea

this date, although she did frequently have diarrhea. Dr. Murphy noted: "She fell and is having some right hip pain. She's fallen twice now with no real cause for the fall, and this is concerning to me." Upon examination, Plaintiff's vital signs were stable. Her affect was flat. There was no edema of any extremities. Dr. Murphy assessed Hypokalemia, pancreatitis, and right hip pain.

On July 21, 2004, Dr. Conley noted Plaintiff continued to have depression and some abdominal pain (R. 515). He then opined: "I feel most of her symptoms are somewhat psychosomatic in nature." He assessed GERD/dyspepsia and chronic pancreatitis, of unclear etiology. He gave her samples of Effexor.

On August 5, 2004, Plaintiff reported to Dr. Abboud for follow up (R. 392). She had been seen in the ER for abdominal pain, and was given fluids and pain medications. Dr. Abboud found her overall stable on the current therapeutic regimen. Upon exam there was no tenderness in the abdomen. His impression was: "Patient with one exacerbation since last visit 3 months ago."

On August 11, 2004, Plaintiff presented to the hospital with complaints of epigastric pain for one day (R. 238). She had a history of pancreatitis. She reported the pain was sharp and at a level of eight or nine out of ten. X-rays of the abdomen demonstrated non-specific mildly dilated loops of small bowel projecting at the left side, but no obstruction. She was diagnosed with abdominal pain, hypokalemia, and history of pancreatitis. The next day Plaintiff was feeling somewhat better, with some continued midepigastric pain at a level of four out of ten. She denied chest pain, palpitations, dyspnea or leg pain. She was discharged, still complaining of tenderness, but denying pain. Her condition was stable, and she could take food and do activities "as tolerated."

Plaintiff saw Dr. Murphy on August 16, 2003, explaining her hospital visit five days earlier for acute pancreatitis (R. 276). She had been placed on Demerol and became sweaty and nauseous

and unable to eat. She was feeling better today, but believed she had an upper respiratory infection ("URI"). She had a productive cough with no fever or chills, just some sweats. Upon exam, her vital signs were stable. She had mild expiratory wheezes, and coarse bronchial sounds. Her abdomen was tender in the epigastric area. There was no edema of any extremities. Dr. Murphy assessed pancreatitis and URI.

Two days later Plaintiff saw Dr. Conley for follow up (R. 514). She complained of epigastric pain and having some dysphagia to solids. Foods were now starting to "stick." Dr. Conley stated: "I also feel she has a component of depression and discussed about trying Effexor to go along with her other medical regimen." He assessed depression and dysphagia to solids, started her on Effexor, and scheduled her for EGD with another dilatation.

On August 26, 2004, Dr. Murphy noted that Plaintiff's lab work looked the best it had since she began seeing her and since she had pancreatitis (R. 274). Plaintiff was complaining of some right hip pain. Her blood pressure seemed pretty good. Dr. Conley had started her on Effexor for anxiety/depression but she said she could not tolerate it because it made her too dizzy. She only took two pills. Upon exam, her vital signs were stable. Her lungs were clear. She had no hepatosplenomegaly, no tenderness over the pancreas, and no edema of any extremity. She had some right hip tenderness with L5 rotated to the right. Standing flexion test was positive on the right. Dr. Murphy assessed pancreatitis, hypertension, and anxiety/depression.

One month later, Plaintiff reported to Dr. Murphy for follow up (R. 272). She had undergone another dilation of the esophagus. She became very sick during the exam. The Schatzki's ring had been dilated. She was now having lower abdominal pain. Upon examination her vital signs were stable. Her lungs were clear with no wheezes, rales or rhonchi. There were no

abnormalities felt in the abdomen and no real epigastric tenderness. The abdomen felt much less

bloated. There was mild tenderness over the ovaries. There was no edema of any extremities. Dr.

Murphy assessed pancreatitis, benign hypertension, and anxiety/depression.

On September 29, 2004, Dr. Conley noted that Plaintiff's H Pylori was positive (R. 535).

Her blood pressure was 116/60. She had no edema. Her lungs were clear and she had soft, positive

bowel sounds. He assessed history of pancreatitis and depression, dysphagia to solids, H Pylori

positive. He discussed possible antidepressant therapy. She said she had tried Effexor but it did not

help. He said he would leave that up to Dr. Murphy.

A pelvic ultrasound showed "a very large ovarian cyst that measures 8 cm in diameter as well

as multiple small ovarian cysts. Most are simple except for a small 2cm in diameter ovarian cyst

with debris within it" (R. 540).

On October 18, 2004, Plaintiff presented to Dr. Murphy with "bronchitis-type complaints"

including chest congestion, green sputum, and nasal congestion. She said she could not lie down

without a pillow, and was "not feeling good at all" (R. 270). Upon examination her vital signs were

stable. Her lungs had coarse bronchial sounds and wheezes, but no rales or rhonchi. Her abdomen

was mildly tender with mild hepatomegaly and no splenomegaly. There was no edema of the

extremities. The assessment was acute bronchitis.

Two days later Plaintiff told Dr. Murphy "if she could just quit coughing she would feel so

much better" (R. 267). She said she was sleeping on four pillows and got really hot at night. She

was short of breath and had soreness in her chest from coughing so much. She had previously used

a nebulizer and it had worked well, so she was going to see if she could use a neighbor's. Upon

examination, she had no fever. Her lungs had wheezes and some rales. There was no hepatomegaly

and no splenomegaly. There was no edema of the extremities.  The assessment was bronchitis, pancreatitis, and hypokalemia.

On October 22, 2004, Plaintiff told Dr. Murphy she was feeling somewhat better regarding the bronchitis (R. 267).  She had borrowed a nebulizer and was using it 2-3 times a day.  Dr. Murphy noted: "Talked to her again about her smoking.  She just has no desire to quit at this time."  Upon examination, her vital signs were stable.  Her lungs had coarse bronchial sounds with wheezes, but improved from the last visit.  The assessment was bronchitis.

On November 11, 2004, Dr. Abboud noted Plaintiff was still having bad days at times, but was overall stable on her current therapeutic regimen (R. 389).  Plaintiff said she was having two to three exacerbations of pancreatitis per month.  She said she started having an "attack" Tuesday and had to take pain medication.  She felt "some better" today, but still very sore.  She was taking her medication as directed.  Upon examination she had slight to moderate tenderness in the epigastric area and left upper quadrant.  The impression was recurring pancreatitis and history of H Pylori status post treatment.

On December 4, 2004, Plaintiff reported constant knee pain at a level of 8 out of 10 prior to therapy and 4 out of 10 after.  She had decreased pain and tenderness.

On December 7, 2004, Plaintiff told Dr. Murphy she had been having nausea and pancreatic pain mid quadrant for the last week  (R. 530).  Her blood pressure was very high, and the doctor noted she looked pale.  Plaintiff said she had not eaten.  She had nausea but no vomiting.  Upon examination, her blood pressure was 142/102. She seemed pale and "had a flat affect as she always has."  She had hyperactive bowel sounds and epigastric tenderness.  Her lungs were clear and there was no extremity edema. The assessment was pancreatitis and vomiting for three days and benign

hypertension. Plaintiff refused to go to the ER despite being advised she probably needed admittance to the hospital.

A December 8, 2004 ventilatory function report was normal (R. 250).

On December 12, 2004, Plaintiff underwent a Mental Status Examination for the State Disability Determination Service, performed by Larry Legg, MA (244). She was brought to the exam by a friend. She had a Florida driver's license -- "haven't got a West Virginia driver's license yet." She owned her own home, where she lived with the friend and her own 15 year old. She was supposed to wear glasses, but she did not bring them with her. Mental status exam showed Plaintiff to be clean and suitably dressed. She was cooperative. Her attitude was serious. Her posture and gait were within normal limits.

Plaintiff said she "ran away from home," got married, and had four children, 23, 20, 18, and 16. She had a 17-year old who passed away in 2002. She had applied for disability that past May. She did not have a medical card, but received food stamps. Regarding her application for disability, she stated: "Applied because I've tried working and I just can't do it. I got sick two years ago with pancreatitis. I go to the doctor all the time; I take an enzyme pill when I eat. Dr. Charles somebody in Beckley is my doctor. I have to follow up with him in February." She had "poor concentration, blunted affect, low energy and loss of interest in activities." She had never received any mental health or substance abuse treatment. She smoked half a pack a day. She last consumed alcohol about 2 ½ years ago. She had been in regular education and her grades were good in school. She was currently not employed "nor is she looking for a job." Her friend had taken odd jobs "lately."

Upon examination, Plaintiff was fully oriented but slightly depressed. Her affect was flat. Her stream of thought, thought content, and judgment were normal. Her insight was fair. She had

no suicidal or homicidal ideation. Her immediate memory was normal, her remote memory was mildly deficient, and her recent memory was severely deficient. Her concentration, persistence, and social functioning were all moderately deficient. Plaintiff reported her activities as most of her day being spent lying either in bed or on the couch.

Mr. Legg found no Axis I or II diagnosis. He noted physical problems of pancreatitis, high blood pressure and asthma, by claimant report. He opined: "There is no diagnosis or condition present today on Axis I or Axis II. Prognosis fair. Capable of managing own finances."

Plaintiff was also examined for the State by Miraflor Khorshad, M.D. (R. 259). Plaintiff's current complaints were listed as persistent stomach pain, unable to bend over, unable to do household shores, and unable to work outside the home because of persistent abdominal pain. She said she also had chronic headaches. She had difficulty swallowing, shortness of breath while walking, but no coughing or wheezing. She had chronic abdominal pain with nausea and diarrhea but no vomiting or constipation. She denied weakness, dizziness, fainting spells and tics.

Upon examination Plaintiff walked with a limp favoring her right leg. Her blood pressure was 118/84. Her lungs were clear with no wheezing. Her epigastric area was tender. Her left knee was also tender with no crepitus, no pedal or leg edema, and no joint effusion. She did not use an assistive device and was able to get off and on the examining table. She was able to sit and squat and heel and toe walk. All ranges of motion were normal except her left knee which was limited by "subjective pain." Her near vision with correction was Right 20/40 and Left 20/30. Her far vision was Right 20/25 and Left 20/20. Hand grips were ok bilaterally. Spirometric results were normal. Dr. Khorshad diagnosed left knee strain; chronic abdominal pain; clinical history pancreatitis; Schatzki's ring; and benign hypertension, controlled. An ERCP and arthroscopy of the left knee were recommended.

On January 3, 2005, Karen Morris, PRN noted Plaintiff had midepigastric left upper quadrant pain to palpation (R. 527). She noted Plaintiff was pale and had a flat effect. Her blood pressure was 112/72. Plaintiff said she had had nausea and vomiting since the beginning of December. She vomited with any solid food. Phenergan made her too sleepy. Ms. Morris diagnosed chronic pancreatitis.

On January 13, 2005, Dr. Murphy noted Plaintiff had a flat affect "as always" (R. 521). Plaintiff reported an increase in nausea. She tried Zofran and "it seems to be really helping. She can eat and take the Zofran." Plaintiff's blood pressure was good. She still reported constant epigastric pain for "three weeks now." Her white blood cell count was elevated. She had had three really good days, but was now hurting again. Dr. Murphy stated Plaintiff needed to "go back to the specialist."

On January 24, 2005, Dr. Murphy wrote a letter to Plaintiff's daughter's high school counselor, saying that Plaintiff and her daughter Kisha were both her [Dr. Murphy's] patients (R. 266). Dr. Murphy's letter to the high school counselor provides:

> I feel that Kisha is a worrier and would like to be able to stay at home, and is needed at home, to help care for her mother who has a chronic medical condition and is very sick.

> If it is possible for Kisha to keep up with her school work and stay at home with her mother on her very sick days, which would probably average 2-3 days per week, I feel this would benefit both Kisha and her mother. I realize it's very important for Kisha to be in school, and I feel that she is a worrier and worries about her grades and trying to stay caught up, and this may help her to do so.

> She tells me she is a good student and promises to work hard to keep her grades caught up. I believe a trial of Homebound of 8 weeks, where she misses 2-3 days per week, would be appropriate at this time.

On January 31, 2005, State agency reviewing psychologist Frank D. Roman, EdD, completed a Psychiatric Review Technique, based upon an affective disorder (Listing 12.04) and an anxiety

23

(Listing 12.06)(R. 365). He then found the impairments were not severe. He opined that Plaintiff would have a mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence or pace. He opined she had no episodes of decompensation, each of extended duration.

That same day, State reviewing physician Thomas Lauderman completed a Physical RFC, opining that Plaintiff could occasionally lift 50 pounds; frequently lift 25 pounds; stand/walk about 6 hours in an 8-hour workday; and sit about 6 hours in an 8-hour workday (R. 379). She had no postural, manipulative, visual, or communicative limitations. She had no environmental limitations except to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. Dr. Lauderman noted that a treating physician statement was on file, but he disagreed with Dr. Murphy's opinion that Plaintiff was disabled and unable to work due to pancreatitis, asthma, GERD, peptic ulcer, hernia, and hypertension. He instead found that the medical evidence indicated Plaintiff could perform medium level work.

On February 4, 2005, Dr. Murphy noted that Plaintiff "found out that pancreatitis does run in the family– her dad's sister and her dad's dad." (R. 518). Plaintiff also complained of some problems of vertigo and explained why she went to the ER on the 21st. She was given Mexlizine. She said it made her a little sleepy but did seem to help with some of her symptoms. She had "a little bit of an appetite." She didn't eat much the other day, however. She said that her daughter stayed home with her approximately three days a week to help with her care. Upon examination Plaintiff's vital signs were stable; her lungs were clear; her abdomen was soft and tender, with normal bowel sounds; and she had no extremity edema.

On February 8, 2005, Dr. Abboud noted that Plaintiff told him there was a history of

pancreatitis in her family, including a paternal grandfather with pancreatitis of non-alcohol etiology and a paternal aunt with pancreatitis of non-alcohol etiology (R. 387). He also noted Plaintiff's UBT results were negative. He diagnosed questionable familial pancreatitis.

Dr. Abboud noted that Plaintiff had overall been stable on her current therapeutic regimen. She was having 2-3 exacerbations a month with her pancreatitis. Her last attack was in December 2004, two months earlier. She started having an "attack" and had to take pain medication. She felt better lately. She was taking Creon as directed. She had no dysphagia, no food or acid regurgitation during the day nor nocturnally, no heartburn, no constipation, no diarrhea, no melena, and no rectal bleeding.

Upon examination, Plaintiff was well-appearing and in no distress. There was direct tenderness over the epigastric area. Dr. Abboud diagnosed H Pylori status post eradication, status post prevacid. He noted her continuing "major problem" of pancreatitis-recurring.

On February 21, 2005, Plaintiff presented to the hospital with complaints of dizziness, no appetite, nausea, diarrhea, and sweats (R. 541). Examination showed nystagmus. She was discharged that same day as stable, but referred for blood pressure check.

On March 4, 2005, Plaintiff reported to Dr. Murphy that she was still having ear pain and sinusitis and sore throat (R. 516). "She is also having some right hip pain from a fall she had a long time ago. It hurts down deep and sometimes into the leg and into the right knee. Still having lots of belly pain. Was up until 3 a.m. three nights ago due to belly pain from pancreatitis." Upon examination, Plaintiff's vital signs were stable; her lungs were clear with no wheezes, rales or rhonchi; she had normoactive bowel sounds, and she had right hip pain with tenderness at the right SI joint. Her L5 seemed rotated to the left. She was able to heel and toe walk. Dr. Murphy assessed

pancreatitis, sinusitis, and right hip pain.

During a follow up three weeks later, Plaintiff told Dr. Murphy she had been nauseated for the last two or three days, and felt so sick she couldn't go to church or attend a funeral "she needed to attend" (R. 547). She was not sleeping well "and would like something for her allergies that doesn't dry her out like Lodrane is doing." Upon examination, Plaintiff's vital signs were stable. Her abdomen was tender, especially in the epigastric area. She had normal bowel sounds. There was no edema of the extremities. The assessment was pancreatitis, allergic rhinitis, bronchial asthma, and insomnia.

On April 25, 2005, Plaintiff told Dr. Murphy she had been having some pretty severe pain from her pancreas (R. 546). "Said Saturday night she didn't think she was going to make it." Was sweating and chilling and "felt like her insides were coming out of her." She had vomiting and diarrhea also, and only had one bite of soup all day. Today she was not in pain but was walking gingerly in a bent forward position. Upon examination, Plaintiff's vital signs were stable; her lungs were clear; her abdomen was tender in the right upper quadrant and epigastric area; bowel sounds were normal; and there was edema of the extremities. The assessment was chronic pancreatitis and allergic rhinitis.

Plaintiff underwent a digestive diseases consultation upon referral by Dr. Abboud on April 27, 2005 (R. 561). Her history was listed as: Chronic pancreatitis since 2003. With constant nausea, occasional vomiting, sweating, dizziness, and epigastric pain. Eats one small meal a day, lost 13 lbs in five months. Upon examination her blood pressure was 132/80. She had right upper quadrant tenderness. Her lungs were clear. The assessment was abdominal pain, GERD, and chronic pain.

Plaintiff then saw Doctor Uma Sundaram, reporting two to three exacerbations per month (R. 554). Zofran helped the nausea and vomiting. Prevacid helped the GERD and heartburn. An ECG showed hiatal hernia and H Pylori. After treatment she was H Pylori negative, however. Her esophagus had been dilated twice. Upon examination, Plaintiff's vital signs were stable; she was fully oriented; her lungs were clear; there was tenderness in the abdomen in the right upper quadrant and mid epigastric area; there was joint tenderness in the right hip and left knee; and there was mild joint swelling of the left knee. Dr. Sundaram's impression was: Abdominal pain, GERD, Heartburn, nausea and vomiting, and chronic pancreatitis. He prescribed Nexium, which Medicaid refused to cover (R. 550), so he said to take Prevacid for one month and if it did not relieve her heartburn Medicaid may then cover the Nexium.

On July 11, 2005, Plaintiff told Dr. Murphy she could no longer go to the physician she had been seeing in Beckley because of her medical card (R. 545). She was now going to Morgantown and had followed up with a gastroenterologist there. H Pylori had now come back negative. She was told she had some ulcerations in the stomach. She reported some nausea and some abdominal pain, but the doctor said she "looks good." She was making herself eat at least twice a day. She was sleeping pretty good. She had nausea but no vomiting or diarrhea, no headache or chest pain. Upon examination, her vital signs were stable. Her lungs had decreased sounds but were clear. She complained of mild tenderness in the epigastric area, but no guarding or rebound. Her lower extremities had 1+ bilateral pitting edema. Dr. Murphy assessed pancreatitis, chronic GERD, peptic ulcer disease, benign hypertension, and surgical menopause.

On August 22, 2005, Dr. Murphy reported that the specialist thought perhaps the pancreatitis was aggravated by high triglycerides and started treatment for that (R. 567). Plaintiff said she had

a sore throat as well as "lots of trouble with heartburn and nausea." She was not eating. Upon examination Plaintiff's vitals were good. Her blood pressure was 114/60. Her pulse was a little high. Her lungs were clear. Her abdomen was diffusely tender in the right upper quadrant with normal bowel sounds. The assessment was peptic ulcer disease, hiatal hernia, chronic pancreatitis, benign hypertension, and upper respiratory infection.

One month later, Plaintiff was still complaining of nausea and dizziness, some days worse than others (R. 565). She was using Albuterol inhalers twice a week for asthma attacks which woke her from her sleep. Upon examination, her vital signs were stable, and her lungs were clear with no wheezes, rales or rhonchi. Her abdomen had mild diffuse tenderness and some hyperactive bowel sounds. The assessment was Asthma, Pancreatitis, Constipation, and GERD.

On October 5, 2005, Plaintiff saw pulmonologist Mark Byrd (R. 617). He noted she smoked half a pack to a pack and a half daily and had done so for 25 or more years. Testing in the office showed mild obstructive ventilatory impairment. Upon examination, Plaintiff was healthy appearing, and breathing comfortably at rest. Her lungs were clear. Her abdomen was soft and nontender. There was no edema of any extremities. Dr. Byrd's impression was: "Middle aged smoker with mild obstructive ventilatory impairment. Complicated by chronic bronchitis most likely due to somking but could also be allergic to her down pillow. Symptoms worse at night. Tobacco dependence. Discusses. May never resolve if does not quit." He prescribed Advair one puff twice a day and Singulair as well as an Albuterol inhaler as needed. "Strongly encourages smoking cessation."

Two weeks later Dr. Byrd found Plaintiff was doing much better with her current medications (R. 616). She had not been able to taper off much from smoking. She denied any intolerance to her

medications. She asked about Commit lozenges for smoking cessation. She denied productive cough, wheezing, unusual dyspnea, palpitations or difficulty sleeping. Upon examination her lungs were clear, her abdomen was soft and nontender, and there was no extremity edema. Dr. Byrd assessed: "Mild to moderate COPD in a current smoker wanting to quit."

On October 24, 2005, Plaintiff reported to Dr. Murphy regarding seeing the specialist (R. 585). He had given her Commit lozenges and said she had mild obstructive airway disease. He told her to quit smoking. "She's going to really try doing this." Upon examination, her vital signs were stable; her lungs were clear; and she had mild epigastric tenderness with mild rebound and guarding. There was no edema but there was tenderness in the right hip. The assessment was pancreatitis, GERD, benign hypertension, tobacco cessation, hypoglycemia, and right hip pain.

Three weeks later, Plaintiff presented to Dr. Murphy with complaints of sinus congestion, sore throat, productive cough, and a fever blister on her lip (R. 583). Upon exam her vital signs were stable. She had no fever, her lungs were clear, and there were no wheezes rales or rhonchi or edema. The assessment was URI and Herpes Simplex I.

On December 5, 2005, Plaintiff saw Dr. Murphy with complaints of an increase in arthritis pain and in her ovaries and suprapubic area (R. 623). She also reported constant nausea, although not today. She denied chest pain or headache. Upon examination, her vital signs were stable, her lungs were clear, her abdomen was mildly tender, and she had normal bowel sounds and no edema of the extremities. The assessment was benign hypertension, chronic pancreatitis, GERD, PUD, and osteoarthritis.

Plaintiff underwent a psychological examination on December 13, 2005, at the request of her counsel (R. 588). The exam was performed by Cynthia Hanag MA, Supervised Psychologist.

Plaintiff said she felt she would be unable to perform work adequately due to her increased physical pain and decreased psychological health. She reported what the psychologist called "pervasive psychological symptoms," such as "significant anxiety which has worsened over the year." She attributed much of her problems to her son's suicide in 2002. Additionally, mounting financial pressures, inability to work, and inability to be active contributed to anxiety and "feelings of sadness." She denied past or current suicidal ideation. She reported severe pervasive physical symptoms, including hip and knee pain and problems contributing to frequent falls. "My legs buckle beneath me sometimes and I just fall." She had severe and frequent headaches, causing her to "get dizzy and sick to my stomach. I can't even move until they go away." She said she no longer drove due to unpredictable episodes of dizziness.

Upon mental status exam Plaintiff was adequately dressed and groomed. She made average eye contact and was friendly, polite, and cooperative. Rapport was easy to establish and maintain. Her short term memory and concentration were both below average. She was fully oriented and had good reasoning. Her affect was appropriate and reactive. She described her own mood as "worried," and the psychologist described it as "depressed and anxious." Her speech was average, and her attention and concentration were adequate for evaluation purposes. She was able to follow instructions. The psychologist believed the evaluation results were valid.

Testing showed Plaintiff's IQ was 78 verbal, 78 performance, and 76 full scale – considered Borderline. She read at a fourth grade level, spelled at the second grade level, but performed math at the seventh grade level. Personality testing was not performed due to her low reading level and "low cognitive ability." The psychologist noted it was "extremely problematic to gain insights into personality because confounded by inability to find words to describe how they feel, understand

concepts of social environment, and poor memory." The Beck Depression Inventory indicated severe symptoms and the Beck Anxiety Inventory indicated moderate symptoms.

Ms. Hanag diagnosed Axis I: Major Depressive Disroder, Recurrent, Severe; and Generalized Anxiety Disorder. She recommended referral to a psychiatrist for appropriate medication, counseling to address depressive and anxious conditions, pain treatment clinic to learn coping skills, and stress management.

Ms. Hanag also completed a mental RFC assessment, finding Plaintiff had Marked limitations in understanding, remembering and carrying out detailed instructions; sustaining attention and concentration for extended periods; responding appropriately to direction and criticism from supervisors; and ability to tolerate ordinary work stress. She had Moderate limitations in understanding, remembering, and carrying out short, simple instructions; exercising judgment or making simple work-related decisions; maintaining regular attendance and punctuality, completing a normal workday and workweek without interruptions from psychological symptoms and performing at a consistent pace without an unreasonable number and length of work breaks; interacting appropriately with public; maintaining acceptable standards of courtesy and behavior; relating predictably in social situations in the workplace without exhibiting behavioral extremes; demonstrating reliability; ability to respond to changes in work setting or processes; ability to be aware of normal hazards and take appropriate precautions; carrying out ordinary work routines without special supervision; setting realistic goals and making plans independently of others; and traveling independently in unfamiliar places (R. 596). Ms. Hanag opined that Plaintiff had had an inability to work from April 1, 2003, through the present.

Ms. Hanag also completed a PRT, opining Plaintiff had an affective disorder (depression)

and an anxiety disorder (R. 602). She would have moderate restriction of her activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace (R. 612). She opined Plaintiff had had one or two episodes of decompensation, each of extended duration.

On December 21, 2005, Dr. Byrd reported Plaintiff had not been compliant with the Commit lozenges because the bad taste made her nauseated (R. 616). She was still smoking one to two packs per day. She still had some sinus drainage and congestion, along with some frontal headaches and occasional epistaxis. Upon examination her abdomen was nontender and she had no edema of the extremities. Dr. Byrd diagnosed Moderate COPD in a middle aged white female smoker.

On January 12, 2006, Plaintiff presented to Dr. Murphy with complaints of nausea and vomiting, heartburn "same as always," not sleeping, and sinus and allergy problems (R. 621). Her abdomen was very distended and taut. She hadn't made it back to the doctor in Morgantown because her car was not running. She was worried about the distention. Upon examination, her lungs were clear. Her abdomen was distended with hypoactive bowel sounds and no tenderness. The doctor was not able to palpate deep enough to determine whether there was hepatospenomaegaly. There was no edema of the extremities. The assessment was abdominal distention, pancreatitis, benign hypertension, GERD, insomnia, and allergic rhinitis. She ordered a CT scan of Plaintiff's abdomen and blood work. The CT scan showed no significant abdominal CT findings.

On February 27, 2006, Plaintiff underwent a neuropsychological evaluation, performed by Dr. Marc Haut upon referral by counsel (R. 689). Dr. Haut stated:

> The patient, herself, is difficult to obtain a history from . . . . She reports difficulty with her short-term memory, but denies problems with concentration. I was not able to get any examples from her about how her short-term memory affects her life. In

terms of her moods, she really denies being depressed, although she reports some anxiety around people. She did acknowledge being sad in the past after her son committed suicide but states that it is easier to deal with at the present time. In terms of specific symptoms of depression to interview, she does acknowledge having decreased enjoyment in life, some feelings of hopelessness and helplessness but no suicidal ideation. Sleep is ok with her medicines, and appetitive is variable . . . .

Dr. Haut found Plaintiff was generally pleasant and cooperative with the evaluation. Her affect was mildly dysphoric. Effort was good, and there was no indication of embellishment of symptoms. On self-report measures, Plaintiff reported severe amount of anxiety and moderate amount of depression. Overall, Dr. Haut found the assessment valid, stating:

In conclusion, the results of this neuropsychological evaluation revealed cognitive deficits largely consistent with this woman's history and level of intellectual functioning. She functions intellectually in the borderline range as per a prior evaluation. Her attention is largely consistent with that, although she has some mild slowing. Her memory is relatively good with only retrieval-based problems. She does well if the information, both verbal and visual, is organized. She does have significant difficulty with her problem solving. I believe this woman qualifies for an organic mental disorder listing 12.02. This is likely the product of a longstanding learning disability and a concurrent problem secondary to her ongoing medical conditions. She also qualifies for a diagnosis of major depressive disorder and a generalized anxiety disorder, although her understanding of these and insight is limited. However, in terms of the B criteria for functional impairment, she really was unable to give me much in her history or examples from her life in terms of how her cognition affects her functioning. She does have some mild problems managing social functioning. Her activities of daily living appear to be mostly limited by her physical problems. She does have problems with her concentration and pace that are at a mild level. Finally, based upon he performance on the Wisconsin Card Sorting Test, I would predict she would have some deterioration in a work-like setting given her mild perseveration.

At the administrative hearing held on January 26, 2006, Plaintiff was asked a series of questions by the ALJ, as follows:

Q: Now, you have pancreatitis.

A. Yes.

Q. That causes you abdominal pain - -

33

A.      Yes.

Q.      . . . nausea, some fatigue, sometimes it causes you to stay in bed all day.  Now that's

pancreatitis.  Is there anything else associated with that that keeps you from working?  Are

those your main symptoms that prevent you from working?

A.      Yes.

Q.      All right.  Do you have any other physical problems that you feel keep you from working?

Physical problems?

A.      I think that's just my, my main they're saying.

Q.      That's your main physical problem that prevents you from working - -

A.      Yes.

Q.      - - is that right?

A.      Yes, because I'm - -

Q.      Are there any other - - I'll ask you once again are there any other physical problems you have

that you feel prevent you from working.

ATTY:       Excuse me, sir, could I ask you - - you mean all by themselves or you meant that - -

ALJ:        Well, either - -

ATTY:       Effect her in some way?

ALJ:        - - contribute to or, or by themselves.  Any physical problems that she feels impairs

her ability to work.

ATTY:       Okay.  What else do you have wrong with you if anything?

A:      Since - - I've been having a hard time concentrating and stuff.

ALJ:    Well, no, I'm talking - - we'll get to that, we'll get to that.  Physical, physical problems.

A:     What do you mean - - just my stomach - -

ALJ:   Anything, anything that matter with your body, physically, anything.

A:     Well, my pancreas and it's hard for me to stoop down with my knee and - -

ALJ:   You have knee pain?

A.     Yes.

. . . .

ALJ:   All right.  So basically it's the pancreatitis and the knee pain?

A:     Yes.

ALJ:   All right.  Now what, what kind of mental problems do you have that you feel prevent you

       from working or limit your ability to work?

A:     I don't concentrate.  I don't even know how to explain it.  I get confused sometimes . . . .

It seems like lately I get real confused and everything else and don't pay attention to - - being dizzy

and all I stopped driving because I didn't want to involve anybody getting hurt or anything else.  I

don't even drive no more.

ALJ:   All right.  So lack of concentration is a problem for you - -

A:     Yea, I get - -

ALJ:   - - right?

A:     - - like confused and - -

ALJ:   And confusion, okay.  Is there anything else that you feel limits your ability to work?

A:     Not - - I don't, I don't think so.

       Plaintiff's counsel then asked her the following questions:

Q:     How many days a month do you think that you feel poorly enough that you don't get out of

35

bed very much? Just an average. Like how many days a month do you feel so badly that you don't even get out of bed very much? Those bad days that you described.

A:     Probably three weeks out of a month or - -

Q:     Well, you're saying most of the time - -

A:     During most of the time.

Q:     - - you don't get - -

A:     Most of the time I don't feel good.

Q:     All right. Do you have somebody with you almost all the time?

A:     Yes.

Q:     Is there a reason for that?

A.     They're afraid I'm going to fall and - - or something is going to happen.

Q:     So your family makes arrangements to try to have somebody with you then?

A:     Yes.

The ALJ then asked the VE whether work would be available for an individual of the Plaintiff's age and educational level, who could perform a range of light work; could perform postural movements occasionally but could not kneel, crawl, or climb ladders, ropes, or scaffolds; should not be exposed to any environmental pollutants or temperature extremes; should work in a low stress environment with no production line type of pace or independent decision making or responsibilities; would be limited to unskilled work involving only routine, repetitive instruction and tasks; and should have no more than occasional interaction with others (R. 787-788). In response, the VE testified that there would be jobs available that the hypothetical individual could perform.

Plaintiff's counsel then asked the VE if any of the jobs he named would be available if the

person missed more than two days of work per month (R. 788). The VE testified that "[t]hese jobs typically permit the worker to miss one day a month."

## III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, ALJ Alexander made the following findings:

1.  The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act so as to be insured for such benefits only through June 30, 2003.

2.  The claimant has not engaged in substantial gainful activity during the period at issue (20 CFR §§ 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.  During the period at issue, the claimant has had the following medically determinable impairments that, either individually or in combination, are "severe" and have significantly limited her ability to perform basic work activities for a period of at least 12 consecutive months: history of patellofemoral joint chondromalacia, left knee; chronic obstructive pulmonary disease, with concurrent, chronic tobacco abuse; history of chronic pancreatitis; history of peptic ulcer/gastroesophageal reflux disease; major depressive disorder; generalized anxiety disorder; and borderline intellectual functioning ( 20 CFR §§ 404.1520(c) and 416.920(c)).

4.  During the period at issue, the claimant has had no medically determinable impairments, whether considered individually or in combination, that have presented symptoms sufficient to meet or medically equal the severity criteria for any impairment listed in Appendix 1, Subpart P, Regulation No. 4 (20 CFR §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  Throughout the period at issue, the claimant has had at least the residual functional capacity to perform, within a controlled, low stress environment, a range of unskilled work activity that: requires no more than a light level of physical exertion; requires no crawling, kneeling or climbing of ladders, ropes or scaffolds, or more than occasional performance of other postural movements; entails no production line type of pace or independent decision making responsibilities; involves only routine, repetitive instructions and

37

tasks; and entails no more than occasional interaction with others (20 CFR §§ 404.1520(e) and 416.920(e))

6.      Throughout the period at issue, the claimant has lacked the residual functional capacity to fully perform the requirements of her vocationally relevant past work as a certified nurse assistant (20 CFR §§ 404.1565 and 416.965).

7.      The claimant throughout the period at issue is appropriately considered for decisional purposes as a "younger individual" (20 CFR §§ 404.1563 and 416.963).

8.      The claimant has attained only a "limited" (seventh or eighth grade) education and is able to communicate in English (20 CFR §§ 404.1564 and 416.964).

9.      The claimant has a "semi-skilled" employment background but throughout the period at issue: 1) has lacked the residual functional capacity to perform and sustain skilled work activity, and 2) has been of such age as to render immaterial to the determination of disability all issues with regard to the transferability of any previously acquired job skills (20 CFR §§ 404.1568 and 416.968).

10.     Considering the claimant's age, level of education, work experience and prescribed residual functional capacity, she has remained capable throughout the period at issue of performing jobs that exist in significant numbers within the national economy (20 CFR §§ 404.1560(c), 404.1566, 416.960(c) and 416.966).

11.     The claimant has not been under a "disability," as defined in the Social Security Act, at any time during the period at issue herein, i.e., since April 1, 2003 (20 CFR §§ 404.1520(g) and 416.920(g)).

(R. 22-33).

## IV.  Contentions

A.     Plaintiff contends:

1.     The ALJ conducted an improper credibility analysis
a. the ALJ's step one finding lacks substantial evidentiary support
b. the ALJ failed to conduct a proper step two analysis of the evidence in the record and gave inappropriate reasons for finding the plaintiff not credible.

2.     The ALJ decided the case on the basis of an incomplete hypothetical question.

B.     The Commissioner contends:

1.     The ALJ's finding that Plaintiff's subjective complaints were not entirely credible is supported by substantial evidence
a.   Step one of the ALJ's credibility finding was correct and made in accordance with the Commissioner's regulations
b.   Step two of the ALJ's credibility finding was correct and made in accordance with the Commissioner's pain regulations.

2.     The ALJ's hypothetical question accommodated Plaintiff's functional limitations.

## V. Discussion
## A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971)(citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984)(quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an

improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

The undersigned United States Magistrate Judge finds substantial evidence does not support the ALJ's decision in this matter, but for somewhat different reasons than addressed by the parties.

## B. Abdominal Pain and Symptoms

Plaintiff has claimed disability in large part due to pancreatitis, since her application filed May 11, 2004 (R. 73). She also claimed left knee problems and high blood pressure as limiting her ability to work. In her application she described her pancreatitis as causing crushing, stabbing, continuous pain in the upper part of her stomach (R. 95). She stated that some days the pain lasted all day and some days she had no pain. Most of the time she was in bed due to the pain and "sick stomach." The pain started on its own, and "you don't know when it will start or when it will stop." Finally, when the pain got bad, she would go to the ER to get pain medication or take a pain pill at home. She was prescribed a digestive enzyme to take with meals and hydrocodone three times a day. She said the hydrocodone made her sleepy. As daily activities she listed only doing laundry and paying bills. She did state she had no problems concentrating (R. 103).

Plaintiff went to the ER in June 2003, for severe abdominal pain. She was hospitalized for ten days, diagnosed with pancreatitis. A CT showed persistent pancreatitis. Plaintiff's treating primary care physician, Jessica Murphy, DO, consistently found epigastric tenderness and diagnosed pancreatitis. Plaintiff consistently reported "lots of" nausea and abdominal pain. While, as the ALJ states, Dr. Murphy originally opined that Plaintiff was "unable to work for the next couple months until we get her pancreatitis resolved," she subsequently opined that Plaintiff was disabled. The ALJ

40

did not mention this further development. Plaintiff underwent a biopsy of the antrum of the pancreas that was normal and an endoscopy that showed mild gastritis and a slight hiatal hernia with a Schatzki's ring. Dr. Murphy referred her to gastroenterologist Conley.

Plaintiff again presented to the ER in November 2003, with nausea, vomiting and upper abdominal pain. She was transferred from Webster County Hospital to the Charleston Area Medical Center. She was given Demerol and diagnosed with abdominal pain with recurrent pancreatitis and hypertension, with no evidence of peptic ulcer disease ("PUD"). Dr. Conley stated that Plaintiff had a "[v]ague history of pancreatitis" noting that most of her labs did not evidence that. His diagnosis was abdominal pain of questionable etiology. He ordered more tests.

An abdominal MRI appeared to show a stenosis of the hepatic duct. An x-ray of the abdomen also indicated what appeared to be stenosis of the hepatic ducts. In December 2003, Dr. Conley noted that the MRCP did reveal stenosis of the hepatic duct, and noted Plaintiff had a "history of" pancreatitis. He diagnosed stricture of the hepatic duct and referred her to yet another specialist, Dr. Bou-Abboud.

Plaintiff presented to Dr. Abboud in January 2004, complaining of mid upper abdominal pain for over six months. Dr. Abboud found she had "exquisite tenderness over the epigastric area." Dr. Abboud diagnosed recurrent pancreatitis; stenosis of the hepatic duct; epigastric pain; GERD; diarrhea; hiatal hernia; rule out Irritable Bowel Disease and true versus artifact hepatic stenosis. He also noted that the hepatic duct stenosis did not explain the pain by itself and should not be contributing to her pancreatitis. A subsequent MRI showed tortuosity of the hepatic duct with no obvious stricturing. This was inconsistent with a prior MRI, and the opinion was that "a diffuse hepatic duct stricture is not excluded."

Dr. Conley then opined that Plaintiff may have had "some irritable bowel," and diagnosed pancreatitis with normal MRCP, emphasizing that a previous MRCP had not been normal.

In February, specialist Abboud opined that the old MRCP showed a questionable stricturing that he believed was an artifact. He found Plaintiff had extreme tenderness in the epigastric area. He suggested a pain clinic. Dr. Conley reviewed the records and diagnosed pancreatitis with possible hepatic stenosis.

The subsequent ERCP was completely normal. Dr. Conley again opined that Plaintiff might have a component of IBS.

In May 2004, Dr. Abboud noted Plaintiff had overall been stable on her current medications, with three sharp episodes over the past few months. Dr. Abboud continued to diagnose chronic pancreatitis.

Plaintiff presented to the ER again in May 2004 for pain in the upper gastric area with nausea and decreased appetite.

On June 14, 2004, Dr. Murphy opined that Plaintiff was currently disabled and unable to work due to pancreatitis, asthma, GERD, PUD, hiatal hernia, and hypertension, "of which the pancreatitis is the most serious."

In July 2004, Dr. Conley opined that Plaintiff's symptoms were mostly psychosomatic in nature, while still assessing GERD/dyspepsia and chronic pancreatitis.

State agency reviewing physician Franyutti opined that Plaintiff's symptoms "were attributable to medically determinable impairments," but disagreed with her treating physician that she was disabled.

In August 2004, Plaintiff reported to Dr. Abboud that she had had one exacerbation in three months.

Plaintiff again presented to the ER in August 2004 for abdominal pain and nausea. She was discharged the next day.

Plaintiff underwent two separate dilations of her esophagus. The Schatzki's ring had been dilated twice. She did have a positive H Pylori test. A pelvic ultrasound showed a very large ovarian cyst as well as multiple small ovarian cysts.

In November 2004, Dr. Abboud noted Plaintiff was overall stable on her current medications, with two to three exacerbations per month. His diagnosis was recurring pancreatitis with H Pylori status post treatment.

In January 2005, Dr. Murphy wrote a letter to Plaintiff's daughter's high school counselor requesting the daughter be permitted to stay home with her mom two to three days a week. She was "needed at home, to help care for her mother who has a chronic medical condition and is very sick." She would need to be home with her mother "on her very sick days, which would probably average 2-3 days per week."

In February 2005, specialist Abboud noted that Plaintiff had been overall stable on her current medications, with 2-3 exacerbations per month of her pancreatitis. Her last attack was two months earlier, and she felt better lately. He still diagnosed her with recurring pancreatitis.

Dr. Abboud referred Plaintiff to yet a third specialist, Dr. Sundaram. Dr. Sundaram diagnosed abdominal pain, GERD, heartburn, nausea and vomiting, and chronic pancreatitis.

In the last physical medical record submitted to the ALJ, Dr. Murphy found Plaintiff's abdomen very distended. She diagnosed abdominal distention, pancreatitis, benign hypertension, GERD, insomnia and allergic rhinitis.

At the hearing, Plaintiff testified her main problem was pancreatitis. She believed she was

disabled mainly due to her pancreatitis.

The ALJ's decision states that Plaintiff had, among others, a "history of" chronic pancreatitis; and a "history of" peptic ulcer/gastroesophageal reflux disease. He then opines:

> [T]here is no objective medical evidence that clearly indicates that the claimant's peptic ulcer disease and gastroesophageal reflux disease have imposed any persistent and significant functional limitations. The claimant has also been indicated to complain of symptoms indicative of irritable bowel syndrome, and also of abdominal pain symptoms of undetermined etiology. No objective evidence clearly indicates that such conditions or symptoms have imposed any significant and persistent functional limitations over any 12 consecutive months during the period at issue. However, the Administrative Law Judge has appropriately and fully considered all of the claimant's conditions, symptoms and impairment-related complaints in determining her residual functional capacity, as further detailed hereinafter.

## 1. The Listings

At the third step in the sequential analysis, the ALJ addressed the listings only in regard to Plaintiff's alleged mental impairments. Although he said he had "appropriately evaluated medical and other evidence pertaining to the claimant's medically determinable impairments in conjunction with all relevant severity criteria contained within the 1.00 musculoskeletal system, 3.00 Respiratory system, and 5.00 digestive system," he did not identify any listings specifically or compare Plaintiff's symptoms and limitations to any specific physical listing. In Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986), the Fourth Circuit first found that the ALJ's reference simply to listing 1.01 was insufficient because

> Section 1.01 actually includes four subsidiary lists of impairments: section 1.02, "active rheumatoid arthritis and other inflammatory arthritis;" section 1.03, "arthritis of a major weight-bearing joint;" section 1.04, "arthritis of one major joint in each of the upper extremities;" and section 1.05, "disorders of the spine." The ALJ did not explain which of those listed impairments were considered to be relevant. He also failed to compare Cook's symptoms to the requirements of any of the four listed impairments, except in a very summary way.

Here, the ALJ even more generally identified the relevant listings than did the ALJ in <u>Cook</u>. He

identified generally the 1.00, 3.00, 1.00 and 12.00 "series of listed impairments." Further, the ALJ

here also failed to compare Plaintiff's physical symptoms to the requirements of any of the listed

impairments at all. As the Fourth Circuit in <u>Cook</u> concluded:

> The ALJ should have identified the relevant listed impairments. He should then
> have compared each of the listed criteria to the evidence of Cook's symptoms.
> Without such an explanation, it is simply impossible to tell whether there was
> substantial evidence to support the determination.

The undersigned United States Magistrate Judge finds the ALJ failed to identify the relevant

listed impairments. He failed to then compare each of the listed criteria to the evidence of Plaintiff's

physical symptoms. "Without such an explanation, it is simply impossible to tell whether there was

substantial evidence to support the determination." <u>Id</u>. Substantial evidence therefore does not

support the ALJ's step-three finding that none of Plaintiff's impairments, alone or in combination

met or equaled a Listing.


## 2. Pain and Credibility

At step four of the sequential analysis, the ALJ is required to determine the claimant's

residual functional capacity, or RFC. The ALJ here stated that in determining Plaintiff's RFC, he

considered "all of the claimant's alleged symptoms in accordance with the requirements of 20 CFR

sections 404.1529 and 416.929, and Social Security Rulings ("SSR") 96-4p and 96-7p. He then

found Plaintiff was not entirely credible. Despite the evidence that pancreatitis was Plaintiff's main

impairment, and the main cause of her disability, the only mentions of Plaintiff's alleged abdominal

pain complaints in his decision are:

Similarly, treating physician Jessica Murphy, D.O. in August 2003 credited the claimant's subjective complaints of nausea and abdominal pain in offering to facilitate the claimant's ongoing welfare eligibility by opining that the claimant would need to be off work for just "another month or two."

. . . .

The record also indicated that the claimant has demonstrated significant, long-term reliance upon potentially addictive narcotic pain medications, a factor which may be considered in evaluating her ongoing subjective pain complaints.

. . . .

Despite the claimant's complaints of abdominal pain and swelling, computerized tomography ("CT") study of her abdomen with and without contrast on January 20, 2006, showed only changes due to a Cholecystectomy without other significant abdominal findings.

. . . .

The claimant has alleged chronic pancreatitis but has previously demonstrated the ability to sustain work activity despite such condition.

Conspicuously absent from the above discussion is any mention of factors that must be considered in assessing pain under 20 CFR 404.1529(c) and 404.929(c), including: The locations, duration, frequency, and intensity of the individual's pain; Factors that precipitate and aggravate the symptoms; The type, dosage, effectiveness, and side effects of any medication the individual receives or has received for relief of pain; Treatment other than medication the individual receives or has received for relief of pain; and any measures other than treatment the individual has used to relieve pain.

The ALJ never mentions the number of doctors Plaintiff saw and the numerous tests Plaintiff underwent to find the cause of her alleged abdominal pain and nausea. His only mention of the numerous prescribed medications she took was that her "long-term reliance upon potentially addictive narcotic pain medications" was to be considered in evaluating her subjective pain complaints.

The undersigned United States Magistrate Judge therefore finds that substantial evidence does not support the ALJ's credibility determination.

### 3. Treating Physicians

The record is indisputable that Plaintiff saw a number of treating and examining physicians for her abdominal pain and symptoms. 20 C.F.R. § 404.1527 states:

(d) *How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion

(1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(I) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times

you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .

(4) *Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

The record in this case evidences numerous visits by Plaintiff to her primary care physician, and no fewer than three different specialists in gastroenterology, all of whom agreed she had at least some type of abdominal disorder. Though most agreed she had recurrent pancreatitis (not "history of" pancreatitis, as the ALJ determined), there were some opinions that she may have had irritable bowel syndrome, peptic ulcer disease, GERD, a very large ovarian cyst, or even that her abdominal pain could have been at least in part psychosomatic. Still, no treating physician opined that Plaintiff was exaggerating regarding her symptoms. Even the State agency reviewing physician opined that Plaintiff's symptoms were caused by a medically determinable impairment.

Further, the record shows undisputedly that Plaintiff saw Dr. Murphy, her primary care physician, Dr. Conley, a specialist, Dr. Abboud, a specialist, and Dr. Sundaram, a specialist, all in

an effort to diagnose and treat her abdominal pain and nausea. All treated her, referred her for tests, and, in some cases, referred her to other specialists. There is no evidence that any of these physicians were seen simply to aid in litigation. These are all therefore treating physicians. "Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." Craig v. Chater, 76 F. 3d 585, 589 (4th Cir. 1996). The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983).

The ALJ mentions in passing only Dr. Murphy, and quotes from an early office visit, in which she opines Plaintiff will be off work "another month or two," neglecting to even mention that Dr. Murphy later opined Plaintiff was disabled from all work due to her impairments– mostly pancreatitis. The ALJ does not mention that Dr. Murphy actually requested Plaintiff's 15 year-old daughter be permitted to stay home from school two to three days a week to care for her "very sick" mother. While the undersigned United States Magistrate Judge may question the wisdom of Dr. Murphy's request, it is still strong evidence that this primary treating physician believed Plaintiff had an illness that required such drastic measures. The ALJ did not even mention that letter or Dr. Murphy's opinion that Plaintiff was disabled. Further, the ALJ did not even mention in passing any of the other treating physicians.

The undersigned United States Magistrate Judge finds that the ALJ did not properly evaluate the opinions of Plaintiff's treating physicians under 20 C.F.R. § 404.1527. He did not discuss Dr. Murphy's opinion that Plaintiff was disabled or indicate what weight he gave this treating

physician's opinion. Worse, he did not even mention any of the three treating specialists. Substantial evidence therefore does not support the ALJ's determination regarding Plaintiff's RFC.

## 4. Hypothetical to the VE

Finally, because the undersigned finds that the ALJ did not properly consider the Listings, Plaintiff's treating physicians' opinions, her RFC, or her credibility, it follows that his hypothetical to the VE is also not supported by the evidence. In particular, the ALJ rejected Plaintiff's counsel's hypothetical to the VE that asked if any jobs would be available for an individual who would be absent from work more than two days per month. The VE responded that there would be no jobs available that Plaintiff could perform if she consistently missed more than <u>one</u> day per month. The ALJ did not explain his rejection of this limitation. Defendant argues:

> [Plaintiff] cites no objective medical evidence to support this argument, such as a functional capacity assessment made by a physician. Additionally, despite her claim that she would miss work at least two days per month due to an attack of pancreatitis, Plaintiff only ever presented for emergency treatment due to such attacks on four occasions during the relevant period . . . .

Plaintiff has, however, cited her treating physician's opinion that she is disabled, which the ALJ did not address. Further, inherent in Dr. Murphy's request that Plaintiff's daughter be able to stay home from school two to three days per week is an opinion that Plaintiff would be unable to even care for herself up to two or three days per week. Dr. Abboud found Plaintiff had exacerbations two to three times per month. These treating physician opinions are at least evidence that Plaintiff would miss more than one day per month. As already stated, "Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." <u>Craig v. Chater</u>, 76 F. 3d 585, 589 (4th Cir. 1996). The

treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983). The ALJ here, however, did not even discuss these doctors or their opinions.

The undersigned therefore finds substantial evidence does not support the ALJ's reliance on the VE's response to his hypothetical.

Upon consideration of all of the above, the undersigned United States Magistrate Judge finds that substantial evidence does not support the ALJ's determination that Plaintiff was not under a "disability," as defined in the Social Security Act, at any time during the period at issue.


## VI. RECOMMENDATION

For the reasons herein stated, I find that substantial evidence does not support the Commissioner's decision denying Plaintiff's applications for SSI and DIB, and I accordingly recommend Defendant's Motion for Summary Judgment be **DENIED**, and Plaintiff's Motion for Judgment on the Pleadings be **GRANTED in part,** by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings consistent and in accord with this Recommendation

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result

in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), <u>cert</u>. <u>denied</u>, 467 U.S. 1208 (1984); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 27 day of April, 2009.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE